STATE of Missouri, Respondent,

v.

Norman WICKIZER, Appellant.

Norman WICKIZER, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 44756, WD 46604.

Missouri Court of Appeals, Western District.

July 27, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1993.

Application to Transfer Denied Sept. 28, 1993.

William J. Swift, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Asst. Atty. Gen., Jefferson City, for respondent.

Before FENNER, P.J., and SPINDEN and SMART, JJ.

SMART, Judge.

The appellant was convicted of the brutal murder and rape of a five-year-old female child. The case was tried to the court rather than to a jury. Norman Wickizer appeals from the judgment finding him guilty of first degree murder, in violation

of § 565.020.1, RSMo 1986 and forcible rape, in violation of § 566.030, RSMo 1986. Wickizer was sentenced to life imprisonment without parole for the murder conviction and to ninety-nine years imprisonment for the rape conviction. Defendant Wickizer also appeals from the denial of his Rule 29.15 motion, which has been consolidated with his direct appeal.

The judgments are affirmed.

Ramia Montgomery was five years old at the time of her death and lived with her mother, Catherine Williams, in Columbia, Missouri. Defendant Norman Wickizer lived nearby with Ramia's aunt. Ramia knew defendant and had interacted with him on various occasions.

On Saturday morning, November 11, 1989, Ramia went to her aunt's house to play with her cousins. Ms. Williams did not see Ramia on Saturday evening or Sunday, which was not unusual because often Ramia would spend the weekend at her aunt's house and return home on Monday morning to attend kindergarten. However, Ramia did not return home on the following Monday morning. Ms. Williams started to look for her daughter and around noon, when she determined that Ramia was missing, she notified the police. Ramia was last seen wearing a green dress with white lace, white stockings and white shoes.

The Columbia Police Department began investigating the report of the missing child on November 13. A search team consisting of police officers and civilians was immediately formed. After the search was underway, Sergeant Jack Phillips was approached by defendant who asked Phillips if anyone had searched an area northeast of where they stood. Defendant indicated that there was a pond in that area where the police should search. Sergeant Phillips informed defendant that a helicopter was scheduled to search that area because it was a fairly open place possible to search from the air. The sergeant told defendant that if he wanted to join in the search to go look in the opposite direction, where the terrain was rocky and wooded and difficult to search by helicopter. Sergeant Kenneth Smith searched the area defendant had mentioned by helicopter and saw a man on the ground, the defendant, waving his arms at the helicopter and pointing at something on the ground. When the helicopter landed, defendant informed Sergeant Smith that he was Ramia's "uncle" and that he had found Ramia's body after spotting her dress in a tree near the same location. Defendant was interviewed by several officers at the police department. He was later charged with Ramia's murder.

At defendant's trial, Dr. Edward Adelstein, the medical examiner for Boone County, offered the opinion that when Ramia's body was found, she had been dead for at least twenty-four hours and not more than forty-eight hours, plus or minus twelve hours. Dr. Adelstein testified that the cause of Ramia's death was asphyxiation due to an injury of the vertebral artery. The injury produced decreased blood flow to the basal part of the brain, filling up the area around the spinal cord with blood which eventually resulted in respiratory arrest and then cardiac arrest. While Dr. Adelstein could not state exactly how the injury occurred, he noted some possibilities: 1) a blunt trauma to the back of the head; 2) the head being "flapped" back very quickly; 3) the head being held and the body twisted; 4) the body being held and the head twisted; or 5) the head being forced forward and jarred. Dr. Adelstein also found a small bruise in the back of Ramia's neck which he testified would not be a common injury that a five-year-old child would sustain from normal play activities. He further concluded that a blunt-force trauma to the area where he found the bruise could have caused the hemorrhage in Ramia's vertebral artery. Ramia also suffered a complete laceration between the vagina and the anal area constituting a complete tearing through the anal sphincter. Based on this physical evidence, Dr. Adelstein concluded that there was forceful penetration to Ramia's vagina prior to death. Based upon circumstantial evidence linking defendant to the murder and rape of Ramia, defendant was found guilty by the court. Defendant appeals

from the conviction and the denial of his post-conviction motion. Defendant's fifteen points on appeal will be addressed in the following order: 1) trial court error; 2) motion court error; and 3) *pro se* points.

### Circumstantial Evidence

Defendant alleges that the trial court erred in overruling the motion of judgment of acquittal at the close of all the evidence and in finding defendant guilty of first degree murder because it deprived him of his right to due process, as guaranteed by the fourteenth amendment to the United States Constitution and Article I, § 10 of the Missouri Constitution. Defendant claims the state's case was "premised entirely on circumstantial evidence and the facts and circumstances were not inconsistent with and did not exclude every reasonable hypothesis of Mr. Wickizer's innocence as to deliberation because choking, strangulation, and a hard slap were excluded as possible means of causing death" and because the pathologist testified Ramia's death occurred as a result of a struggle which produced a tear in the vertebral artery.

Prior to the recent Missouri Supreme Court decision in *State v. Grim*, 854 S.W.2d 403 (Mo. banc 1993), if a case was based solely on circumstantial evidence, the facts and circumstances relied on to establish guilt had to be consistent with each other and with the hypothesis of the defendant's guilt and the facts and circumstances also had to be inconsistent with and exclude every reasonable hypothesis of the defendant's innocence. *State v. Roby*, 756 S.W.2d 629 (Mo.App.1988).

The holding in *State v. Grim* eliminated the different treatment employed in circumstantial evidence cases which required the state to meet a higher standard in affirming criminal convictions in circumstantial evidence cases. 854 S.W.2d 403 (Mo. banc 1993). In the past, the prosecution has been required to meet a different burden in circumstantial evidence cases because of a basic distrust for criminal convictions based on circumstantial evidence. *Id.* at 405. Over the years, Missouri courts have relaxed the standard by including the following language with the circumstantial evidence standard: *"[T]he evidence need not be absolutely conclusive of guilt, nor must the evidence demonstrate the impossibility of innocence." Id.* at 406 (emphasis in original). In determining that a different standard for circumstantial evidence cases is confusing and unnecessary, the Missouri Supreme Court stated:

No reason remains to perpetuate this different rule. Any societal distrust of circumstantial evidence has long been abandoned. We no longer need to hold circumstantial evidence cases to a higher standard than direct evidence cases. If a jury is convinced beyond a reasonable doubt, so long as the evidence meets the minimal appellate standard required by due process, we need not disturb the result simply because the case depended wholly, mostly, or partially upon circumstantial proof.

*Id.* at 406.

Now, in determining whether sufficient evidence has been presented to support a conviction based solely on circumstantial evidence, appellate review is limited to the determination of whether sufficient evidence has been presented for a reasonable juror to find the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). An appellate court accepts all of the evidence and inferences favorable to the conviction as true and disregards all evidence and inferences to the contrary. *Id.* A brief recitation of the evidence is in order.

Defendant told police that he had seen Ramia on Saturday, November 11, at about 11:00 a.m., at which time he fixed her a couple of hot dogs for lunch. Later that day, defendant was planning to accompany some friends, Mark and David Nealy, on a fishing trip. David Nealy testified that he had been with defendant from 10:30 a.m. to 2:00 p.m. on that afternoon. At about 2:00 p.m. defendant and the Nealy brothers decided to go fishing. Defendant instructed the men to meet him at his residence in ten or fifteen minutes. Defendant was wear-

ing a brown jumpsuit at that time. After waiting thirty minutes on defendant, the Nealy brothers went to defendant's home to find him for the fishing trip. He was not there. The Nealys asked defendant's girlfriend where he was. She responded that he had gone somewhere out in the woods.

The Nealys did not see defendant again until about 4:30 p.m. when he arrived back at the parking lot in front of their home. Defendant was coming out of the woods when they saw him. He had changed clothes and was wearing jeans and a shirt when he came out of the woods. Defendant's clothing was covered with "stick tights." The three men then proceeded with their fishing trip.

On the way to the lake, the Nealys quizzed defendant as to what he had been doing in the woods. Defendant indicated that he had been having sexual intercourse in the woods. David Nealy thought defendant was acting strange in that defendant was less talkative than usual and he did not want to discuss what he was doing in the woods. When defendant and the Nealy brothers arrived at the lake, defendant busied himself by removing stick tights from his clothing, rather than fishing.

David Nealy's brother, Mark Nealy, testified that defendant was gone for three hours after defendant suggested they meet again in ten to fifteen minutes. Mark testified that defendant looked scared during the car ride to the lake. Pearlie Moore, who lived with David Nealy, also testified, duplicating various portions of the Nealys' story.

After Ramia had been reported as missing and defendant had joined in the search for Ramia, defendant told police that he had spotted Ramia's dress in a tree. Two police officers investigated the tree at different times. Both officers had a difficult time locating Ramia's clothing. Sergeant Smith testified that he investigated the tree where defendant said he saw Ramia's clothes. Defendant left his shirt hanging on the tree so the sergeant would be able to locate it. When Smith found the tree with defendant's shirt on it, he walked around the tree searching without success for Ramia's dress. Smith got up into the tree and looked deep within its branches for the dress. He finally saw a ball-shaped cloth stuck down inside the tree. Defendant did not mention to Smith that he had to move branches to see the dress. In fact, defendant originally stated the green color of the dress caught his eye. After being questioned further about his story, defendant stated that he walked so close to the tree that the dress brushed his arm. The dress was found folded in a square bundle with white cotton tights and shoes in the center of the bundle with the sleeves of the dress tied in a knot. The dress had stick tights or seedpods all over it.

Near the location of Ramia's body, several items of physical evidence were found. Police recovered a cigarette butt (Marlboro), a green fiber, a white Bic lighter and an Oh Henry candy bar and wrapper. A search of defendant's house uncovered Oh Henry candy bars and wrappers in the living room, kitchen, master bedroom and other bedrooms at the residence. The lot numbers on the candy bars collected at the residence matched the lot numbers of those found near the assault scene. David Nealy's testimony concerning the fishing trip also included a reference to defendant eating an Oh Henry candy bar on the way to the lake to go fishing. Defendant told police that the cigarette butt could be his because he smoked the same brand and he often smoked in the woods. Defendant also mentioned that his fingerprints might be on Ramia's body because he had touched her during lunch.

D.N.A. testing was done on a semen stain found on Ramia's dress. Autorads (autoradiographic tests) from December 27, 1989 and January 25, 1990 were generated by Cellmark Diagnostics. The December 27, 1989 autorads were similar to D.N.A. samples obtained from defendant, but did not constitute a conclusive match under Cellmark's matching standards. The January 25, 1990 autorads matched D.N.A. samples obtained from defendant and the frequency of the banding pattern was one in 6,500. During the defense's case, Dr.

Schanfield, director of the Analytical Genetic Testing Center, testified on cross-examination that under the standards employed by his laboratory, both autorads would have been considered a match because the standards of his laboratory were less restrictive than Cellmark's. Additionally, semen collected from Ramia's dress revealed the presence of blood group substance H and PGM Type 2-1. This blood type was consistent with samples obtained from defendant. Approximately thirteen percent of the general male population of the United States possesses both blood group substance H and PGM 2-1 in their semen. Also, pubic hairs recovered from Ramia's dress were similar to known samples obtained from defendant. Finally, saliva containing blood group substance H was detected on the Marlboro cigarette butt found where Ramia's dress was found. The detection of blood group substance H is consistent with the sample taken from defendant.

A complete review of the evidence presented in this case reveals that sufficient evidence was presented to support the conviction of Norman Wickizer for the murder of Ramia Montgomery. The trial court did not err in so finding. Point is denied.

### Consecutive Sentences

■■■ Defendant contends that the trial court erred when it sentenced him to consecutive sentences for first degree murder and rape. The trial court, defendant contends, believed that consecutive sentences were mandated under § 558.026, RSMo 1986. Defendant claims the imposition of consecutive sentences deprived him of his right to due process, as guaranteed by the fourteenth amendment to the United States Constitution and Article I, § 10 of the Missouri Constitution. Defendant argues that § 558.026 permits a trial judge the discretion to impose concurrent sentences when other offenses are committed at the same time as a sexual offense.

Defendant misstates the law in his argument and the cases he cites to support this proposition are not on point. Section 558.-026 states:

Concurrent and consecutive terms of imprisonment.—1. Multiple sentences of imprisonment shall run concurrently unless the court specifies that they shall run consecutively; except that, in the case of multiple sentences of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid and for other offenses committed during or at the same time as that rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid, the sentences of imprisonment imposed for the other offenses may run concurrently, but the sentence of imprisonment imposed for the felony of rape, forcible rape, sodomy, forcible sodomy or an attempt to commit any of the aforesaid shall run consecutively to the other sentences.

This statute specifies that if a defendant is convicted of one of the enumerated sex offenses and other offenses committed during or at the same time as the sex offense, then sentencing on the other offenses may run concurrent to each other, but the sentence on the sex offense shall run consecutively to the other offenses. The statute does not leave the trial court any discretion in such an instance. Defendant argues that the Missouri Supreme Court interpreted § 558.026 in support of his proposition in *Williams v. State*, 800 S.W.2d 739 (Mo. banc 1990). However, this case does not support defendant's contention. In *Williams*, defendant was convicted of two counts of rape and two counts of sodomy, both listed offenses in the statute. In discussing the meaning of the statute, the court stated the following:

We agree that there is ambiguity in the statute. *The language makes it clear that sentences for "rape, forcible rape, sodomy, forcible sodomy, or attempt to commit any of the aforesaid" must be run consecutively to "other sentences," which are defined as "multiple sentences of imprisonment ... for other offenses committed during or at the same time...."* The statute establishes two kinds of offenses for sentenc-

ing purposes—the listed offenses and "other offenses." *It states clearly what the court must do if the defendant is convicted of an offense in each class.* It does not, however, say in explicit language what must be done if there are multiple convictions of those offenses listed. We believe that the ambiguity must be resolved, not so much through a "rule of lenity" as in favor of according the trial court maximum discretion.

800 S.W.2d 739, 740 (Mo. banc 1990) (emphasis added).

Defendant misreads *Williams* as giving the trial court discretion when defendant commits one of the enumerated offenses and an offense not listed. However, *Williams* clearly states that the trial court has no discretion in such a circumstance and that the trial court only has discretion when the defendant has been convicted of two or more of the listed sex offenses. Thus, the trial court did not err in sentencing defendant to consecutive sentences for the rape and murder convictions. Point is denied.

### Reasonable Doubt Instruction

Defendant next contends that the trial court erred in submitting the jury instruction defining reasonable doubt, patterned after MAI–CR3d 302.04, because defendant was denied his right to due process, as guaranteed by the fourteenth amendment to the United States Constitution and Article I, § 10 of the Missouri Constitution. Defendant argues that the language "firmly convinced" suggests a higher degree of doubt than is constitutionally required for acquittal and the statement that the law does not require proof which "overcomes every possible doubt" could have resulted in a finding of guilt based upon a degree of proof below that required by due process.

In *State v. Antwine,* 743 S.W.2d 51, 62–63 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), the Missouri Supreme Court approved the "firmly convinced" language found in MAI–CR3d 302.04, stating:

The "firmly convinced" language contained in the MAI definition is not new. It is substantially the same as that found in the federal instructions, and has been employed in federal and state courts alike. It is intended to assist lay jurors in their understanding of the legal phrase "beyond a reasonable doubt." The instruction achieves that purpose; in our view, "firmly convinced" is essentially synonymous with "beyond a reasonable doubt."

(footnotes omitted); *see also State v. Barnard,* 820 S.W.2d 674 (Mo.App.1991). Furthermore, MAI–CR 3d 302.04 is a mandatory patterned instruction adopted by the Missouri Supreme Court, which this court lacks the authority to declare erroneous. *State v. Crawley,* 814 S.W.2d 8 (Mo.App. 1991). Therefore, we hold that the trial court did not err in submitting the reasonable doubt instruction to the jury. Point is denied.

### Findings and Conclusions

Defendant contends that the motion court committed clear error when it adopted verbatim the state's twenty-three page proposed findings of fact and conclusions of law because it deprived defendant of his right to due process, as guaranteed by the fourteenth amendment to the United States Constitution and Article I, § 10 of the Missouri Constitution. Defendant contends that the motion court's action reflects no independent reflection from the motion judge as to the judgment that was rendered and thus the court improperly delegated its judicial responsibilities to the state. Defendant also claims that the trial court's action in adopting the state's findings and conclusions verbatim violated defendant's right to have his case determined by a court vested with judicial power, as guaranteed by Article V, § 1 of the Missouri Constitution in that by adopting verbatim the state's proposed findings the motion court improperly delegated to the state the function of trying and determining cases in controversy and conferred judicial power to declare the law on the state.

Review of defendant's point is limited to the determination of whether the motion court was clearly erroneous in adopting the state's findings of fact and conclusions of law verbatim. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). The findings and conclusions of the motion court are deemed clearly erroneous if this court is left with a definite and firm impression a mistake was made. *State v. White*, 798 S.W.2d 694, 697 (Mo. banc 1990). Defendant bases his argument on the case of *Nichols v. Collins*, 802 F.Supp. 66 (S.D.Tex.1992). The court in *Nichols* regarded the trial court's action of adopting verbatim the State of Texas' thirty-five page proposed findings as one of several factors indicative of trial court bias and supporting the court's finding of cumulative constitutional error. *Id.* at 78–79. *Nichols* is not persuasive. First, there is no evidence of trial court bias in this case. Secondly, adopting proposed findings and conclusions is not in itself evidence of bias or of abdication of judicial responsibility. The attorney for each party should seek to draft such fair, objective and comprehensive proposed findings and conclusions that the judge could be comfortable adopting them verbatim. Of course, the court should carefully scrutinize proposed findings and conclusions, and should edit or rewrite as necessary to reflect the precise findings and conclusion of the court. The preparation by the court of its own findings and conclusions is preferred. *Malone v. State*, 747 S.W.2d 695, 699 (Mo.App. 1988). But adoption of proposed findings verbatim does not necessarily indicate error. In *Goad v. State*, 839 S.W.2d 749, 751 (Mo.App.1992), rejecting a challenge to the motion court's action in adopting the state's proposed findings this court stated:

> As long as there are no inconsistencies between the findings of fact and the actual facts, and the findings and conclusions are sufficiently specific to permit meaningful review, there is no error. When the proposed findings of fact and conclusions of law respond to each and every allegation made and when it is clear from the record that the motion court carefully examined each allegation, the verbatim adoption of the state's proposed findings would be an appropriate option.

839 S.W.2d 749, 751 (Mo.App.1992) (citations omitted). The sole basis of defendant's alternative allegations of error also rests upon the trial court's action in adopting the findings and conclusions verbatim. Thus, in accordance with *Goad*, the motion court did not commit clear error in adopting the state's proposed findings and conclusions. Defendant's point is denied.

### Motion to Disqualify Motion Court Judge

Defendant next contends that the motion court erred when it denied the motion to disqualify itself for cause because it deprived defendant of his right to due process as guaranteed by the fourteenth amendment to the United States Constitution. Defendant claims that since the motion court judge served also as the finder of fact in the bench trial that culminated in defendant's convictions, the motion court could not fairly consider in the post-conviction action whether trial counsel rendered ineffective assistance.

As defendant has aptly pointed out, the Missouri Supreme Court recognized in *Thomas v. State*, 808 S.W.2d 364, 367 (Mo. banc 1991), that a post-conviction movant is entitled, as a matter of due process, to disqualify for cause a biased judge. However, in the instant case, defendant does not specifically allege any bias on the part of the trial court/motion court judge. Instead, defendant contends that the mere fact that the motion judge was also the fact finder at the trial level in and of itself requires the conclusion that the motion judge could not fairly consider the post-conviction action.

This state's supreme court stated in *Thomas* that "[t]here is little, if any, administrative justification for the assignment of a different judge to the post-conviction motion." 808 S.W.2d 364, 366 (Mo. banc 1991). The court also stated two additional compelling reasons for barring the application of Rule 51.05 to post-conviction proceedings: 1) the trial judge is in a much

better position to resolve defendant's effectiveness of counsel claims because of his presence at the trial; and 2) employing the same trial judge in the motion court proceedings prevents unnecessary delay associated with the addition of a new judge. *Id.* at 366–67.

Defendant relies solely on the fact that the trial judge and the motion judge were one and the same to show bias on the part of the trial judge. This fact does not show that the trial judge was biased in the post-conviction proceeding. Defendant has failed to show any bias on the part of the trial judge and thus the motion court did not err in overruling the motion to disqualify the motion court judge for cause. Point is denied.

### Ineffective Assistance of Counsel

Defendant argues that the motion court clearly erred in denying his motion for post-conviction relief because he was denied his right to effective assistance of counsel as guaranteed by the sixth and fourteenth amendments to the United States Constitution and Article I, § 18(a) of the Missouri Constitution. Defendant claims he was denied effective assistance of counsel in that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under the same or similar circumstances by 1) calling as a witness Dr. Schanfield; and 2) for failing to call Bobbia Carter as a witness.

Appellate review of the denial of a Rule 29.15 motion is confined to the issue of whether the findings of fact and conclusions of law of the motion court are clearly erroneous. *State v. Anderson*, 785 S.W.2d 596, 600 (Mo.App.1990). The motion court's determination is clearly erroneous only if after reviewing the entire record, the appellate court has a definite and firm impression that a mistake has been made. *Id.*

To establish ineffective assistance of counsel, defendant must satisfy the *Strickland* two-prong test, showing (1) counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under substantially similar circumstances, and (2) that defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Review begins with the presumption that counsel is competent and movant has the "heavy burden" of proving counsel's ineffectiveness by a preponderance of the evidence. *Amrine v. State*, 785 S.W.2d 531, 534 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990). Finally, appellant must show that a different outcome would have resulted but for counsel's errors in order to show that he was prejudiced by such errors. *Sanders v. State*, 738 S.W.2d 856, 860–61 (Mo. banc 1987).

It is also important to note that ineffective assistance of counsel claims relating to "trial strategy" do not provide a basis for post-conviction relief. *Rainwater v. State*, 770 S.W.2d 368, 370 (Mo.App. 1989). Counsel is vested with wide latitude in defending his client and should use his best judgment in matters regarding trial strategy. *Stuckey v. State*, 756 S.W.2d 587, 593 (Mo.App.1988). Additionally, courts reviewing such claims should refrain from employing hindsight when reviewing counsel's conduct at trial. *State v. Lewis*, 785 S.W.2d 656, 660 (Mo.App.1990).

### Dr. Schanfield

First, defendant claims trial counsel was ineffective for calling Dr. Schanfield as an expert witness on the subject of D.N.A. Cellmark performed D.N.A. testing for the state on a semen stain found on Ramia Montgomery's dress. A set of autorads was produced from the D.N.A. testing procedure on December 27, 1989 and a second set was produced on January 25, 1990. Under Cellmark's standards, the autorads produced on December 27 did not match a known D.N.A. sample obtained from defendant. Cellmark declared the autorads produced on January 25, however, to be a match and to have a banding frequency pattern of 1 in 6,500. During the defense case, Dr. Schanfield testified on cross-ex-

amination that under his laboratory's standards it was reasonably probable that both sets of autorads would be declared to constitute a match. Also, Dr. Schanfield related that Cellmark's standards were more conservative than those employed by his laboratory.

Defendant suggests that a reasonably competent attorney under similar circumstances would have determined, prior to trial, that there was a reasonable likelihood that both sets of autorads generated by Cellmark matched known D.N.A. samples obtained from defendant under the standards employed by Dr. Schanfield's laboratory and that Cellmark's match criteria was more conservative than Dr. Schanfield's standards. Thus, defendant argues that a reasonably competent attorney would not have called Dr. Schanfield as a witness. Defendant claims that Dr. Schanfield's testimony prejudicially enhanced the reliability of Cellmark's test results.

The motion court found this claim to be without merit, noting that:

> The credible evidence at the motion hearing indicated that attorney Schlegel was reasonably educated in forensic DNA technology, had procured the advice of experts and developed a strategy for attacking the credibility of the state's DNA evidence offered at trial. The strategy was to show that the DNA evidence linking movant to the killing of Ramia Montgomery was inconclusive due to inconsistent test results. This strategy evolved from reports from Dr. Schanfield based upon his study and critique of Cellmark documents and his knowledge of Cellmark's forensic DNA testing procedures. Since Dr. Schanfield's laboratory did not do any independent testing on the state's evidence, there is no reason for attorney Schlegel to inquire of them whether their testing standards were different. The focus of attorney Schlegel's inquiry was whether there was any basis to attack the credibility of Cellmark's findings or otherwise exclude their findings from evidence since they were the only laboratory to perform DNA testing in movant's case. In addition, Dr. Schanfield's deposition indicated that he even provided material to attorney Schlegel suggesting areas of inquiry at trial. The prospect of questions pertaining to differing match criteria used at different laboratories never arose. Under these circumstances this court cannot find that a reasonably competent defense attorney would have been able to predict that Dr. Schanfield would give testimony enhancing the reliability of Cellmark's results upon cross-examination. It is apparent that trial counsel more than adequately prepared for trial and did everything that a reasonably competent defense lawyer would do in defending his client under these circumstances. No defense attorney can be expected to predict all conceivable ways any of his witnesses may be cross-examined such that a defense witness's testimony might be rendered less effective than desired or in some cases damaging due to a creative or sometimes lucky cross-examination. Further, even if this court assumed for purposes of argument that trial counsel was ineffective in this regard, movant has not satisfied the prejudice prong of the *Strickland* test because the outcome would not have been different. Even if Dr. Schanfield had not been used as a witness the state's DNA evidence would have been admitted into evidence at trial as one piece of evidence among other pieces of evidence proving the guilt of the movant. The purpose in calling Dr. Schanfield as a witness was to discredit the state's DNA evidence. The cross-examination testimony of Dr. Schanfield, while not necessarily helpful to the defense or as effective as it was intended to be, did not hurt the defense. The court's finding of guilt was based upon the totality of all the evidence and did not solely hinge upon the DNA evidence.

This court's review is limited to a determination of whether the trial court's findings were clearly erroneous. Generally, the selection of witnesses is a matter of trial strategy, which is unchallengeable in an ineffective assistance of counsel claim. *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987). As the motion court stated, in

preparing for defendant's case, trial counsel is not expected to know every question that could be asked on cross-examination. Counsel in this case was well educated on the subject of D.N.A. testing and consulted many authorities to expand his knowledge in this area. Defendant has failed to show that counsel's conduct fell below that expected of a reasonably competent attorney. Additionally, as the motion court explained, counsel also failed to show defendant was prejudiced in any way by counsel's actions. Point is denied.

### Bobbia Carter

■ Defendant next claims that trial counsel was ineffective for failing to call Bobbia Carter as a witness. Defendant alleges that Ms. Carter would have testified about a conversation she had with an unknown male at the Wabash bus station during which he related information surrounding Ramia's death. Ms. Carter testified that while she was reading the paper at the bus stop, a man approached her and stated "that's really bad what happened to that little girl." The stranger proceeded to tell Ms. Carter that the little girl was hit in the back of the head with a rock. Also, it was alleged Ms. Carter could have testified that she was shown a police photo array and did not select defendant as the individual who she spoke with at the bus station. Failure to present such information, defendant claims, was ineffective assistance of counsel.

The motion court made the following finding on defendant's claim:

In paragraph 36.ii of the amended motion movant claims he was denied effective assistance of counsel when counsel failed to present evidence Bobbia Carter was unable to select Mr. Wickizer from a photo lineup. Movant claims that Carter spoke to a person at the Wabash Bus Station who gave details about Ramia Montgomery's death. When shown a photo lineup containing movant's picture she was unable to select movant from the array. Although Carter testified at the motion hearing, there was no evidence that indicated that her testimony would be both admissible and helpful to the defense at trial. Carter could not say specifically that the information given to her by the stranger was not obtained from local media and the stranger was never located and identified. Since she was not a witness to the crime her testimony would have dubious evidentiary value. Counsel cannot be found ineffective for failing to use a witness whose testimony in all likelihood would not have been admissible and who in any event would not have been helpful to the defense case. This claim is denied.

Our review is limited to determining whether the findings of the motion court are clearly erroneous. Counsel's decision on what witnesses to call to testify on behalf of defendant is a matter of trial strategy. *Sanders*, 738 S.W.2d at 858. In this case, Ms. Carter testified at the motion hearing and stated that she could not remember what day she had encountered the stranger nor could she remember if it was before or after the incident had been released by the news media. Such a witness cannot be deemed as critical to defendant's case. The motion court correctly found that counsel did not err in omitting Ms. Carter from defendant's witness list. Defendant has failed to show that the result would have been different in this case with the testimony of Ms. Carter. Point is denied.

### Pro Se Points

■ Defendant requested permission from this court to file a separate *pro se* brief. On March 10, 1993, this request was denied. Pursuant to defendant's request, appellate counsel included as many points as possible, selected from the *pro se* brief by defendant. Defendant also attempts to rely on *pro se* exhibits. These exhibits have not been incorporated into the record and, thus, the exhibits will not be reviewed by this court. *See State v. Cooper*, 811 S.W.2d 786, 790 (Mo.App.1991).

■ The following three *pro se* points that defendant has included in his appellate brief were not presented to the motion court: 1) defendant's claim that he was

denied effective assistance of counsel when trial counsel failed to bring to the court's attention that the court failed to "invoke the rule prior to voir dire"; 2) defendant's claim that trial counsel was ineffective for failing to question defense witness Dr. Moses Schanfield about a "further comments" section of his report; and 3) defendant's claim that he was denied his right to effective assistance of counsel when his attorney misrepresented an affidavit at trial. Claims not presented to the motion court cannot be raised for the first time on appeal. *Amrine*, 785 S.W.2d at 534–35. Thus, defendant's above claims of ineffective assistance of counsel are denied.

### Waiver of Jury Trial

■ Defendant next contends that he received ineffective assistance of counsel when his attorney coerced him into waiving his right to a jury trial. At a hearing called to specifically address the voluntariness of defendant's waiver of a jury trial, defendant stated the reason he was waiving his right to a jury trial was because he did not believe a fair and impartial jury could be assembled in this type of case. Defendant stated that he believed he would receive a more favorable result from a court-tried case.

Defendant cites nothing in the record to substantiate his claim that he was coerced into waiving his right to a jury trial. The record shows that counsel advised defendant that by waiving his right to a jury trial he might increase the chance the state would not seek the death penalty. The decision was made by defendant. Such advice falls into the realm of trial strategy which is not challengeable in an ineffective assistance of counsel claim. *Rainwater*, 770 S.W.2d at 370. Thus, defendant has failed to meet his burden. Point is denied.

### Waiver of Frye Hearing

■ Defendant also claims that he was denied his right to effective assistance of counsel when trial counsel waived his right to a hearing on the state's D.N.A. evidence based on *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the theory of which was adopted in *State v. Biddle*, 599 S.W.2d 182 (Mo. banc 1980) (polygraph testing). Defendant claims that his attorney waived this hearing to save the county the cost and time associated with a *Frye* hearing, thus evidencing counsel's conflict of interest by which he was prejudiced.

Defendant fails to provide substantiation from the record for his claim that he was "coerced" into waiving his right to a *Frye* hearing. The record shows again that counsel advised defendant that by waiving his right to the *Frye* hearing he might incur favor and be able to increase the possibility that the state would not seek the death penalty. Such advice falls into the realm of trial strategy which is not challengeable in an ineffective assistance of counsel claim. *Rainwater*, 770 S.W.2d at 370. Thus, defendant has failed to meet his burden. Point is denied.

### Additional Physical Evidence

■ Defendant also contends that trial counsel was ineffective for failing to investigate the following items found at the crime scene: 1) a pair of women's underwear; 2) a styrofoam cup; and 3) two tissues. Additionally, defendant complains that counsel failed to investigate the people who live near the location of where Ramia's body was found. Lastly, defendant states counsel should have had tests run on the semen stain on the victim's dress to see if marijuana was present in the stain. Defendant speculates that he would have been exonerated had counsel conducted an investigation of the aforementioned matters.

Defendant has waived this point for appellate review because it was not presented to the motion court. In his motion, he alleged that the police department had erred in failing to investigate these matters, but did not allege fault of trial counsel. Claims which have not been made to the motion court cannot be raised on appeal. *Amrine*, 785 S.W.2d at 534–35. Thus, this point is denied.

### Failure to Call Witnesses

Next, defendant contends that trial counsel was ineffective for failing to call the

following witnesses: 1) Nekima Brownlee Crawley; 2) Treveon Williams; 3) Kenneth Montgomery, and 4) Bobbia Carter.[1]

■ Our review is limited to determining whether the findings of the motion court are clearly erroneous. Counsel's decision concerning the testimony to be presented at trial is a matter of trial strategy. *Sanders*, 738 S.W.2d at 858. Counsel is presumed to be competent, *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, and is given wide latitude in conducting a defense, using his best judgment in matters of trial strategy. *Stuckey*, 756 S.W.2d at 593.

Defendant claims that Nekima Brownlee Crawley would have testified that she saw Ramia in the early evening on the day Ramia was killed. At the post-conviction hearing, counsel stated he was reluctant to call Nekima because she is a child and he had a difficult time interviewing her and did not believe she would make a reliable witness. Defendant also claims that Treveon Williams could have testified that he saw Nekima and Ramia in the park when it was getting dark on the day of the murder. Counsel had an investigator talk with Treveon. The investigator concluded that this child was wholly without credibility. Lastly, defendant claims that his counsel should have called Kenneth Montgomery, who allegedly made a statement to the police that he saw a man in a brown jumpsuit take Ramia into the woods after it was dark. However, when counsel's investigator talked to Montgomery, Montgomery said that he saw *defendant* take Ramia into the woods. This testimony could hardly be said to be helpful to defendant.

Counsel made sufficient investigation into these witnesses stories and concluded that each person's testimony would not be beneficial to defendant's case. Counsel's conduct did not fall below minimum standards of competency. Thus, the motion court was not clearly erroneous in finding that counsel's decisions were sound trial strategy. Point is denied.

*Failure to Impeach Witnesses*

■ Finally, defendant contends that trial counsel rendered ineffective assistance of counsel in failing to impeach the following witnesses: 1) Catherine Williams; 2) Eddie Fulton; and 3) Edward Adelstein. Generally, the decision whether or not to impeach a witness with prior inconsistent statements is a matter of trial strategy and cannot be the basis for an ineffective assistance of counsel claim. *Berry v. State*, 714 S.W.2d 676, 678 (Mo.App.1986).

■ Defendant bases his claim of trial counsel's error in failing to impeach Catherine Williams and Eddie Fulton with an exhibit which is not before this court. Defendant fails to cite to the record to support this contention. Thus, this claimed error is waived. Next, defendant contends that his trial counsel was ineffective for failing to impeach Dr. Adelstein with a statement he made at defendant's preliminary hearing regarding the estimated time of Ramia's death. At the preliminary hearing, Dr. Adelstein offered his opinion that Ramia had died between twenty-four and forty-eight hours prior to the time her body was found. At trial, he said the same thing, but added the qualification that it could have been plus or minus twelve hours either way. During the Rule 29.15 hearing, the following testimony was elicited from trial counsel:

Q. Do you remember any discrepancies between [Dr. Adelstein's] testimony at the preliminary hearing and the trial concerning the time of death or lapse of time?

A. Oh, well, as to time of death, I imagine the record will reflect that what he said at [the] preliminary hearing may have been different from what he said at trial. When we talked to him in a private interview, he was candid enough to say that this is a very inexact science. And on the basis of that, I knew that any attempt to impeach him with any representation that he made about the specific time of death would be met with that kind of response. And our other investi-

---

1. This court has already denied defendant's allegation of error for counsel's failure to call Bob-
bia Carter to testify for defendant. This will not be addressed a second time here.

gation, contacts with other experts in the area of pathology gave us the same opinion, so our final conclusion was that there was no way to impeach Dr. Adelstein with anyone or any source that says you can ascertain a specific time of death.

Q. So I guess you didn't see much mileage in that at trial in trying to—

A. None at all.

Based upon trial counsel's testimony, the motion judge concluded that counsel reasonably found that efforts to impeach Dr. Adelstein's testimony concerning time of death would not be fruitful. The motion court was not clearly erroneous in finding no ineffectiveness in counsel's decision. Point is denied.

The judgments are affirmed.

All concur.